**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CESAR EDUARDO GOMEZ CARRASCO, | Case No.: 3:26-cv-00856 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| TRANSUNION RISK AND ALTERNATIVE DATA SOLUTIONS, INC., | |
| Defendant. | |

## **COMPLAINT**

Plaintiff, Cesar Eduardo Gomez Carrasco ("Plaintiff" or "Mr. Gomez Carrasco"), by and through his counsel brings the following Complaint against Defendant TransUnion Risk and Alternative Data Solutions, Inc. ("Defendant" or "TRADS") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., arising out of Defendant's publication of inaccurate information and sale of a consumer report to non-party Tessera Data, Inc. ("Tessera") who then resold the information to non-party Checkr, Inc. ("Checkr"), which falsely stated that Plaintiff's Social Security number ("SSN") was unverifiable and portrayed him as a fraudster. Plaintiff also pleads, in the alternative, a claim for negligence arising from Defendant's failure to use reasonable care in furnishing SSN-verification information for foreseeable use in employment-related background screening.

## **INTRODUCTION**

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA").

1

2.      TRADS is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its databases and furnishes these consumer reports to other consumer reporting agencies and employers, which are ultimately used to make decisions regarding whether to offer employment to certain consumers.

3.      As part of its consumer reports, TRADS also provides information about consumers' SSNs, which TRADS knows is often used to verify a consumer's identity and whether they are permitted to work in the United States.

4.      Regardless of the results of the rest of the background check, TRADS knows that an employer seeking verification of a prospective employee's SSN will almost always deny a consumer's application of employment if the consumer's SSN cannot be verified.

5.      TRADS falsely reported to Tessera, who in turn reported to Checkr, who in turn reported to Plaintiff's employer, that Plaintiff's SSN was unverifiable, making it appear as if Plaintiff did not have a valid SSN. TRADS' reporting is flagrantly inaccurate and untrue.

6.      Defendant knows that when it reports that a consumer's SSN is unverifiable, employers frequently treat that information as materially adverse in the employment context, including by suspending or terminating existing work or denying employment applications.

7.      Defendant falsely published and sold inaccurate information stating that Plaintiff's SSN was unverifiable, which Checkr incorporated into employment background reports. The reporting was inaccurate and misleading.

8.      Plaintiff possesses a valid and verified SSN.

9.      Defendant negligently published and sold a consumer report containing inaccurate information purporting to be about Plaintiff to Tessera

2

10.     Upon information and belief, Defendant knew or had reason to know that Tessera would rely on that information and incorporate and resell that information, which would in turn be republished by Checkr in employment background reports

11.     Checkr's background report incorporating Defendant's inaccurate information caused UberEats to deny Plaintiff's application.

12.     Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory SSN verification using reliable and authoritative sources before publishing the information to Tessera.

13.     Had Defendant performed even a cursory review using reliable and authoritative sources, it would have discovered that Plaintiff has a valid and verifiable SSN.

14.     Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in inaccurate reporting concerning Plaintiff.

15.     Defendant's policies and practices harm workers and job applicants by causing employers to receive materially misleading information suggesting that a consumer's identity cannot be properly verified.

16.     Defendant's inaccurate reporting caused Plaintiff to be denied the employment opportunity with UberEats, leaving him without income needed to meet his financial obligations.

17.     As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

18.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities and wages; loss

of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

19. Plaintiff also pleads, in the alternative, a claim for negligence because Defendant owed Plaintiff a duty to use reasonable care when furnishing SSN-verification information for foreseeable use in employment-related background screening.

20. Alternatively, as a result of Defendant's negligence, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities and wages; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## **PARTIES**

21. Plaintiff is a natural person who resides in Ansonia, Connecticut, within the confines of New Haven County, Connecticut. Plaintiff is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

22. Defendant TransUnion Risk and Alternative Data Solutions, Inc. ("Defendant" or "TRADS") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661. TRADS can be served through its registered agent, Illinois

4

Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703. Defendant is authorized to do business in the State of Connecticut including within this District.

23.    TRADS is a "consumer reporting agency" ("CRA") as defined in 15 U.S.C. § 1681a(f). TRADS is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) for employment purposes to third parties, including through intermediaries such as Checkr, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

24.    Among other things, Defendant furnishes SSN-verification and related information for use in employment decision-making, both directly and indirectly. Defendant sells consumer reports to employers directly or through other CRAs for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

## JURISDICTION AND VENUE

25.    Jurisdiction of this court arises under 28 U.S.C. § 1331 because Plaintiff alleges violations of federal law, namely 15 U.S.C.§ 1681 *et seq.*

26.    Defendant transacts business in this District; Defendant purposefully avails itself of the protections of this District; and Defendant regularly directs business at this District, such that personal jurisdiction is established.

27.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

28.     This Court also has supplemental jurisdiction of Plaintiff's state law claim under 28 U.S.C. § 1367, as Plaintiff's claims all derive from a common nucleus of operative fact such that they form the same case and controversy under Article III of the United States Constitution.

## STATUTORY BACKGROUND

29.     Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

30.     While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

31.     Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

32.     Consumer reports that contain factually incorrect information are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

33.     Consumer reports that contain materially misleading information suggesting that a consumer's identity cannot be verified are not maximally accurate.

## THE FCRA'S PROTECTIONS FOR CURRENT AND PROSPECTIVE EMPLOYEES

34.     Despite its name, the Fair Credit Reporting Act covers more than just credit reporting; it also regulates consumer reports like the one Defendant prepared in Plaintiff's name. The FCRA regulates employment background check reports prepared directly or indirectly in a consumer's name.

35.     The FCRA provides a number of protections for current employees and job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

36.     In the parlance of the FCRA, background checks are "consumer reports." 15 U.S.C. §§ 1681a(d).Entities that furnish, publish or contribute information used in consumer reports qualify as consumer reporting agencies.

37.     The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

38.     Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

39.     Defendant disregarded its duties with respect to the reports and information concerning Plaintiff.

### DEFENDANT'S ILLEGAL BUSINESS PRACTICES

40.     Over the past 15 years, there has been increased collection and aggregation of consumer data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

41.     As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

42.     The background check industry takes in revenues in excess of three billion dollars annually.

43.     Oftentimes, background screening involves SSN-verification processes used to assess whether a consumer's SSN matches identifying information.

44.     This SSN verification procedure is generally created by running automated searches through giant databases of aggregated SSN data. The reports are created and disseminated with little to no manual, in-person review, and the records are rarely directly reviewed in creating background checks or verifying a consumer's SSN.

45.     Upon information and belief, TRADS does not verify SSN information directly with the Social Security Administration.

46.     TRADS is well aware that an employer will not hire a consumer if TRADS is unable to verify that consumer's SSN.

47.     Defendant knows unverifiable SSN reporting frequently results in adverse employment actions.

48.     Given that Defendant is in the business of selling consumer reports and publishing background information, Defendant is well aware of the FCRA and the harm caused to consumers by inaccurate reporting.

49.     Defendant places its business interests above accuracy by reporting incomplete or inaccurate information rather than implementing adequate quality-control procedures.

50.     Defendant prioritizes automation in its report-generation process, thereby avoiding the costs associated with additional review necessary to identify and correct inaccurate or incomplete information.

51.     Defendant charges its customers the same price for reports in which it cannot verify a consumer's SSN as it does for reports in which it can.

52.     Proper quality-control review would have revealed that Plaintiff's SSN was valid and verifiable.

### FACTUAL ALLEGATIONS
### PLAINTIFF APPLIES TO WORK FOR UBEREATS JUNE 2024

53.     Plaintiff is the primary financial provider for himself, his spouse, and their two children.

54.     In or around May 2024, Plaintiff secured a work authorization and began working as a handyman to support his family.

55.     Unfortunately, Plaintiff's work as a handyman was too inconsistent for him to adequately provide for his family. Accordingly, Plaintiff began looking for a flexible, supplemental form of income.

56.     On or about June 10, 2024, Plaintiff decided to apply to drive for UberEats to supplement his income.

57.     Plaintiff was particularly excited about the opportunity because the position was flexible, and he could create his own schedule.

58.     That same day, Plaintiff completed and submitted his application, which included his full name and SSN, to UberEats.

### UBEREATS ORDERED A BACKGROUND CHECK REPORT ABOUT PLAINTIFF

59.     UberEats has contracted with Checkr to conduct background checks on its employees and prospective employees.

60.     Checkr contracts with Tessera to provide information about employees, which include but is not limited to information concerning SSN verification.

61.     Upon information and belief, TRADS contracts with Tessera to provide consumer reports to Tessera which include information pertaining to SSN verification.

62.     On or about June 10, 2024, UberEats ordered from Checkr an employment background check consumer report concerning Plaintiff.

63.     Upon information and belief, in or around June 2024, in accordance with its procedures, Checkr ordered a consumer report about Plaintiff, including SSN information from Tessera.

64.     Upon information and belief, in or around June 2024, in accordance with its procedures, Tessera ordered a consumer report about Plaintiff, including SSN information from Defendant.

65.     Upon information and belief, Tessera received Plaintiff's consumer report from TRADS concerning Plaintiff's SSN.

66.     Upon information and belief, Tessera published the information it obtained from Defendant concerning Plaintiff to Checkr.

67.     Defendant knew or had reason to know that the requested information about Plaintiff was to be resold to Plaintiff's current or prospective employer. Defendant knew or had reason to know the information would be used in employment decisions.

68.     In preparing and selling a consumer report about Plaintiff, wherein TRADS inaccurately published that Plaintiff had an unverifiable SSN, TRADS failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of §1681e(b).

10

## DEFENDANT PUBLISHED AN INACCURATE BACKGROUND CHECK REPORT

69.     Within that consumer report, Defendant published inaccurate SSN-verification information concerning Plaintiff.

70.     Checkr relied upon the information sold by Defendant to Tessera, and in turn to Checkr, and published to UberEats inaccurate information about Plaintiff.

71.     Specifically, Checkr's employment background check consumer report about Plaintiff included a materially inaccurate representation that Plaintiff's SSN was unverifiable.

72.     An "unverifiable" SSN is materially adverse information in the employment context and signals that the individual's identity cannot be confirmed.

73.     The report falsely suggested that there was a problem with Plaintiff's identity or identifying information.

74.     An "unverifiable" SSN suggests that some sort of fraud is at play.

75.     TRADS' reporting about Plaintiff made it appear as though Plaintiff was committing some sort of fraud and/or intentionally misrepresenting his SSN.

76.     Plaintiff obtained a valid SSN on or about May 14, 2024, and has since then used that SSN for employment without issue (except for UberEats).

77.     Defendant failed to take reasonable steps to verify Plaintiff's SSN.

78.     A cursory query of reliable and authoritative sources available to Defendant would have confirmed that Plaintiff's SSN was valid and verifiable.

79.     Instead, upon information and belief, Defendant relied on information generated from third-party commercial databases that contain incomplete or inaccurate SSN-related information.

11

80.    Upon information and belief, Defendant did not use additional verification procedures when its database returned an "unverifiable" result.

81.    The sole reason Defendant reported Plaintiff did not have a valid SSN was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Tessera, and was ultimately published to UberEats.

82.    Had Defendant followed the most basic of reasonable procedures, it would have discovered that Plaintiff's SSN was indeed valid and verifiable.

83.    By preparing and selling a consumer report about Plaintiff, wherein Defendant published inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of §1681e(b).

84.    Alternatively, in preparing and selling a consumer report about Plaintiff, wherein Defendant published to Checkr for resale to Plaintiff's prospective employer that Plaintiff's SSN was unverifiable, Defendant breached its duty of reasonable care and caused Plaintiff's prospective employer to deny his employment application.

**UBEREATS DENIED PLAINTIFF'S EMPLOYMENT APPLICATION**

85.    In or around June 2024, Plaintiff UberEats denied Plaintiff's employment application.

86.    Plaintiff was confused by the denial, as he did not anticipate any issues with his application or background check.

87.    Shortly thereafter, Plaintiff reached out to UberEats to inquire as to why his application was denied.

88. Plaintiff was shocked to learn that his SSN was falsely reported as unverifiable by TRADS.

89. Plaintiff did have a valid and verifiable SSN.

90. Plaintiff had no reason to believe there was any issue with his SSN, as he had previously used it for employment without issue.

91. Because his SSN was reported as unverifiable, UberEats denied Plaintiff's employment application.

92. UberEats' suspension resulted from the inaccurate reporting contained in the background report.

93. Specifically, Defendant reported Plaintiff did not have a valid SSN despite contradictory information maintained by reliable third-party resources. Those records were available to Defendant prior to Defendant publishing Plaintiff's consumer report, but Defendant failed to obtain or perform even a cursory review of such information.

**PLAINTIFF DISPUTED THE MISINFORMATION IN DEFENDANT'S CONSUMER REPORT**

94. Recognizing there was a grave mistake, and hoping it was just a system fluke, Plaintiff attempted to correct the inaccurate reporting.

95. Eventually realizing that he needed assistance, Plaintiff disputed the inaccurate information that his SSN was not verifiable with UberEats.

96. Plaintiff was baffled by any issues related to verifying his SSN. To resolve the issue so that he could begin working for UberEats, Plaintiff sent a copy of his Social Security card and driver's license to UberEats.

97. Unfortunately, UberEats stated it was unable to accept his documents and declined to proceed with hiring Plaintiff.

98.     Plaintiff also disputed through Checkr.

99.     Plaintiff was unable to resolve the issue through either entity despite his efforts.

100.    Plaintiff grew tired and frustrated as every time he disputed with UberEats, UberEats directed him to Checkr and vice versa. Plaintiff became increasingly frustrated attempting to correct the error.

101.    Plaintiff submitted multiple applications with other gig employers, and his applications were approved without issue.

102.    Plaintiff worked for the other gig employers, but despite his best efforts, he could not earn as much working for those gig employers as he could working for UberEats.

103.    Frustrated, Plaintiff contacted UberEats to inquire as to why he could not work for UberEats.

104.    UberEats informed Plaintiff that Checkr could not verify his SSN and that there was a data discrepancy.

105.    Due to Defendant's inaccurate reporting and resulting loss of income, Plaintiff was unable to work for UberEats.  This loss of income led to financial instability and placed a substantial strain on Plaintiff's relationship with his wife.

106.    Plaintiff  feared that he would be unable to support his family, including his two young children (ages 4 and 7).

107.    The inaccurate reporting caused Plaintiff stress, anxiety, and frustration. He felt hopeless when his efforts to correct the inaccurate reporting went unanswered. Consequently, Plaintiff suffers from sleepless nights.

108.    Plaintiff's time was also wasted; this was valuable time that Plaintiff otherwise would have spent with his family.

109.    Plaintiff earns less working for other gig companies than he would have working for UberEats.

110.    As of the filing of this Complaint, Plaintiff remains unable to drive for UberEats.

111.    Upon information and belief, at no point since Plaintiff secured his SSN, has his SSN been unverifiable.

112.    Upon information and belief, at no point since the request for SSN information was made to Defendant did Defendant communicate with the SSA to properly verify Plaintiff's SSN or the accuracy of its reporting.

113.    Upon information and belief, Defendant does not employ a human being to review the consumer reports it prepares prior to communicating the results of those consumer reports to end users because it would be more costly to do so.

114.    As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and advancements in the future; loss of time and money trying to correct the inaccurate reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

115.    Alternatively, Defendant owed Plaintiff a duty of reasonable care in furnishing SSN-verification information for foreseeable use in employment background screening and breached that duty.

116.    Alternatively, as a direct and proximate result of Defendant's negligence, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment

opportunities and wages; loss of economic opportunities and positions and advancements in the future; loss of time and money trying to correct his background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to follow Reasonable Procedures to Assure Maximum Possible Accuracy

117. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

118. Defendant is a "consumer reporting agency" as defined by §1681a(f).

119. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by §1681a(c).

120. At all times pertinent hereto, the above-mentioned consumer report was a "consumer report" as that term is defined by §1681a(d).

121. Defendant violated §1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of at least one consumer report it sold about Plaintiff as well as the information it published within the same.

122. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and advancements in the future; loss of time and money trying to correct the inaccurate reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to his reputation; loss of sleep; lasting psychological

16

damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

123.    Defendant willfully violated §1681e(b) in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under §1681o.

124.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to §§1681n and/or 1681o.

## COUNT II
### Negligence

125.    Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

126.    Defendant owed Plaintiff a duty to use reasonable care in furnishing SSN-verification information for foreseeable use in employment background screening.

127.    Defendant knew or should have known that inaccurate SSN-verification reporting would foreseeably result in denial of employment opportunities.

128.    Defendant breached its duty of reasonable care by furnishing inaccurate SSN-verification information concerning Plaintiff for use in employment decision-making.

129.    As a direct and proximate result of that breach, Plaintiff suffered damages.

130.    As a result of Defendant's negligence, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation;

17

loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

131. Defendant's conduct reflects a conscious disregard for the foreseeable harm caused by furnishing inaccurate SSN-verification information for employment use.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 1st day of June 2026.

By: */s/ McKenzie Czabaj*
McKenzie Czabaj, AZ Bar No. 036711
**Consumer Justice Law Firm PLC**
8095 North 85th Way
Scottsdale, Arizona 85258
Phone: (480) 626-2376
Fax: (480) 613-7733
Email: mczabaj@consumerjustice.com

*Attorneys for Plaintiff*
*Cesar Eduardo Gomez Carrasco*